Case 23-3671 Keith Mustin v. Lyneal Wainwright et al. Argument not to exceed 15 minutes per side. Counsel, you may proceed for the appellant. Good morning, your honors, and may it please the court. My name is Elizabeth Bixby and I represent plaintiff appellant Keith Mustin. And before I begin, I'd like to reserve four minutes of my time for rebuttal. All right. Mr. Mustin is a devout Muslim. He faithfully adheres to the tenets of the Islamic faith. But while he was incarcerated at Marianne Correctional Institution, the prison substantially burdened his religious exercise. Could you speak a little louder? Oh, certainly, your honor. If you raise the podium, you're taller than the last speakers. Oh, no, I'm sorry. There we go. Is this better? Much better. Great. Thank you. While Mr. Mustin was incarcerated at Marianne Correctional Institution, prison officials substantially burdened his religious exercise in ways that violated RLUPA and the Free Exercise Clause. And Marianne's treatment of religious practices was not equal among religions. The prison made facially discriminatory distinctions between religions in ways that violated the Equal Protection Clause. And worse still, when Mr. Mustin spoke up about his religious liberties being violated, private food service contractors at Marianne soon retaliated against him by issuing a false misconduct report. The District Court erred in dismissing all of these claims at the pleading stage. I'd like to begin with the claims related to diet and ceremonial foods during the Muslim holy month of Ramadan. The first of these has to do with the nutritionally inadequate, religiously forbidden, and simply unsafe foods that were provided to Mr. Mustin during the Muslim holy month of Ramadan. So during Ramadan, of course, Muslims would fast from sunup to sundown, so they could only eat two meals a day. And so what Marianne provided for those two meals a day fell far short of what RLUPA and the Constitution demand. For his pre-dawn breakfast, Mr. Mustin was given expired or otherwise unsafe food like raw eggs. For dinner, he was sometimes given pork-based meats, which, of course, the Muslim faith forbids. The pork-based meat, is this the argument about the turkey bologna and turkey ham and where the commas should go? Yeah, I think, so my friend on the other side tries to argue that maybe when it says cooked turkey, bologna, or ham, that cooked turkey applies to describe bologna or ham, and not as its own sort of independent third thing. Even if that were a plausible reading of the complaint, of course, at this stage, the only inferences and the only interpretations that can be drawn are in Mr. Mustin's favor. And that's particularly so because he was pro se below, and so this court has said that that means we need to give a liberal construction of his complaint and even an active interpretation. And so even if this court thinks maybe there could have been a comma to make it more clear, that's not enough to dismiss the claim at this stage. And it's also not even... How did pork and ham not get to be pork? Yes, well, I agree. I think ham and bologna are traditionally pork-based meats, and so I just... You could have beef bologna, but it's usually called beef bologna. Yeah, but turkey, I have turkey salami in my fridge. Turkey bologna and turkey ham are both products that you can buy all the time, and that's what you would think they would provide. I mean, those are products that you can buy. I think also the inclusion of cooked before turkey makes it especially implausible that it would apply to... So it says cooked turkey, bologna, or ham. I think the addition of cooked makes it especially implausible, the reading that Ohio advances, because I don't think you traditionally cook bologna or ham. They're just sort of like turkey ham or turkey bologna. I think they're sort of ready-to-serve deli meats. Well, it depends if you're talking about a dirt... Well, we don't need to get into that. I was about to launch into a discussion of how one cooks ham, and I think that was not going to be a productive route to explore. Yeah, so I just think, again, even if Ohio's reading were plausible, at this stage, the only interpretation of the complaint that can be read is the one in Mr. Musson's favor, which is that these were pork-based meats that were sometimes served to him at dinner, and they were smashed. So that's the only explicit... I mean, as I recall it, does the word pork appear, or simply that relying on the, quote, turkey bologna? I think the bologna or ham. So yeah, the word pork does not appear, but I think, again, a common sense reading, and the most sort of common form of bologna and ham are pork-based. And again, that pork-based meat was smashed together with the side dishes at dinner, so he couldn't eat those either. And in any event, the side dishes were too small to provide adequate calories and nutrition, given that Muslims only get two meals a day during Ramadan. And this court's precedent makes clear that that violates RLUIPA and the free exercise clause, and it's really not a close case. So in Colvin, this court held that prisoners have a First Amendment right to a nutritionally adequate diet that respects their religious restrictions. And in Welch, it specifically held that during during that month. And because RLUIPA is even more protective than the free exercise clause in the prison context, conduct that violates the free exercise clause necessarily also violates the more protective RLUIPA. Now, the district court rejected these claims because it said that he didn't allege he suffered harm from these dietary problems, but that's simply not right. The complaint clearly alleges that he suffered what he called spiritual injuries. He was distracted from his Quran, from focusing on praying, and from fulfilling his religious obligations. That's R9 PHID 131, as well as being at risk, or later says he suffered physical injuries. But even putting the physical injury aside, this court has recognized spiritual injuries like this as compensable in Hurd and Welch. And the district court similarly erred in dismissing Mr. Muslin's claim that the prison failed to provide him dates, the ceremonial food of dates during Ramadan. Are the dates religiously required or simply traditional? I would say they're religiously required. I'm sorry? They're religiously required. The Quran requires that the daily fast is broken with a date during Ramadan. Are there cases relating to that? There aren't, Your Honor, but RLUIPA makes very clear that, you know, and of course President Nelson makes clear that even if some practitioners of a religion may not follow a particular religious exercise, what's important is that to that individual plaintiff, the religious exercise is sincere and, you know. I mean, I was mostly looking at the question of what the provision of things that are forbidden, there's a lot of cases on that, the question of are there things that if the prisoner feels religiously obliged, that they're obliged to provide? Yes, so I would say this is controlled by both Haidt and Ackerman. So in Haidt, the prison provided fry bread, but it refused to provide corn pemmican and another type of ceremonial food for Native American religious ceremonies. And again, the Court of Knowledge in Haidt, it may not be that every practitioner of this religion, you know, thinks that those foods are required, but these particular plaintiffs did and that's what matters. And similarly in Ackerman, this court held that the prison was required to provide meat and dairy and cheesecake during certain Jewish holidays. And it wasn't that there were other cases saying, you know, meat and dairy and cheesecake are required for these Jewish holidays, it was that, you know, that case arose in summary judgment, but there was, you know, testimony that the prisoners viewed that as religiously required. And, you know, this court has said that it's not permitted under either RLUIPA or the free analysis. It's just, is it sincere in their, you know, religious exercise? And so, as I said, this claim is really controlled by Haidt and Ackerman. The district court didn't address those cases. It relied instead on this court's opinion in Robinson, which says that, you know, a prisoner has no constitutional right to the specific foods he desires. And that is true, but that's not the issue here. It's not that he just wants dates, it's that his religion requires him to eat dates to break his fast. And so that really is a distinction between this case and Robinson. Now, my friend on the other side speculates that perhaps Mr. Muston could have supplemented his diet during Ramadan with foods from the commissary, but that doesn't justify the dismissal for at least four reasons. The first is that this is just pure speculation. Ohio doesn't put in any evidence. It didn't put in any below, you know, to say that dates are available from the commissary. And of course it ignores that the only inferences that can be drawn from the complaint at this stage are those of Mr. Muston's favor. And in fact, the state doesn't even specifically claim that dates were available. It just sort of vaguely alludes to supplementing his diet. But Haidt and Ackerman tell us that other foods do not suffice if the religion requires a specific type of ceremonial food. You know, as this court put it in Haidt, Ralupa does not permit a deny wine for communion service on the grounds that grape juice is a reasonable substitute. And again, Haidt itself, the prison allowed certain ceremonial foods, but not others, which this court held to state a plausible Ralupa violation. And second, even if dates were available at the commissary, which again, the state is not directly claiming, the state still must show that dates would have been available from the commissary and allowed to be consumed by Mr. Muston at the sundown when he broke his fast. That is why this court rejected a similar argument in Ackerman. In Ackerman, while meat and dairy were unquestionably available at the commissary, those plaintiffs' religion required them to have that meat and dairy with mealtimes, and the prison didn't allow plaintiffs to take commissary purchases into the meal hall. And we just have no idea whether Mr. Muston could have brought commissary purchases, and made them available to him at sundown. And then finally, this is just a bit of an absurd argument on these facts as alleged. The complaint alleges that the prison's imam went to the trouble and the expense of providing dates to the prison, and did it through an approved vendor, and that there were enough dates for everybody who needed them, but they just still stopped providing them nine days into Ramadan. And so this court need not sort of wade into any closer hypotheticals, because this case is clear. And then moving on to the remaining Ralupa claim, which is related to the Jummah, which is the mandatory weekly congregate pair for Muslim men, which can only happen on Friday afternoons. So Maryam had a space that was large enough to hold all of the regular attendees of Jummah, about 60 people. But instead of using that space, they instead packed them into a small classroom, and stuffed it to approximately double the fire capacity, because they were holding Christian events on Friday afternoons in the chapel instead. And Mr. Messon has positively stated that that's a substantial burden on his religious exercise under either formula. Is what happened that he actually attended, but believed that the space was unsafe because it was too crowded for fire purposes? Precisely, Your Honor. But the fact that he continued to attend does not defeat his claim. I assume my time has expired, but may I continue? So, you know, it doesn't defeat his claim for three reasons. And so the first is that in the context of Ramadan dietary claims, this court has said that substantial pressure doesn't mean you have to give into the substantial pressure to have a substantial burden. Is substantial pressure different from substantial burden, or is that just a linguistic fumble? I guess substantial burden is what I always thought of. Yeah. So this court has basically articulated two formulations of substantial burden test. And one is that there's substantial pressure to modify behavior, and that the other is you have to choose between following the precepts of your religion and forfeiting benefits. And the Jumu'ah claim meets either standard. It's substantial pressure not to attend because he was worried about his safety. And also he was forced to choose between attending Jumu'ah and the benefit of personal safety. And just briefly to finish the last question, just because he continued to attend does not mean he doesn't have a claim. It can't be that the most devout adherents, the ones who persist despite substantial pressure or substantial burden, are the ones without a claim. That's clearly not what reluqo envisioned when Congress enacted this very broad statute to protect religious liberties. And again, in the Ramadan dietary context, this court has said you can have a claim. You don't need to show that you gave in to violating your fast or breaking your fast inappropriately to show that you still have a claim because the prison didn't give you enough nutrition and calories to sustain you during that month. And this court has made clear that effectively barring is just another way of showing substantial burden, but substantial pressure is sort of a separate test. So it doesn't need to be successful substantial pressure, just so that substantial pressure was there. And I'll reserve the remainder of my time for rebuttal. Thank you. Let me ask you, do you have anything to say about whether our Luper statue allows for monetary damages against state officials sued in their individual capacity? I do, Your Honor. So, you know, Ohio did not make any argument on this in their briefs, but the Supreme Court's intervening decision in Tansin has made clear that this court's previous decision in Haidt was wrong and has been so undermined that the three-judge panel would be empowered to overrule it. And that's for a few reasons. So Haidt very strongly relied on Sossaman's reasoning. Haidt said Sossaman goes a long way towards resolving this case. But Haidt now tells us, or Tansin now tells us that Sossaman was very limited. It was limited to only the context of official capacity suits because of the sovereign immunity implication. Haidt has overread Sossaman as being broader than it actually is because it makes clear that Sossaman was limited to the official capacity context and that even if a clear statement rule was required in this context, Lupa's text is clear enough to allow damages. So just to go briefly into that. So RLUPA, like RFRA, went out of its way to ensure that individual capacity damages were available. It defined government twice over to include individual officials. It would have been super fluid to include that but not allow damages because if there are no damages, you can only get injunctive or declaratory relief and that's already available against officials in their official capacity. The second is that as Tansin explains, appropriate relief looking back to common law does include damages. And RLUPA also reinstates and strengthens the priesthood protections. So you need at least those same avenues for relief against officials as existed pre-Smith which included damages. And then RLUPA is actually even more clear than RFRA that it allows damages. In RLUPA, Congress limited available remedies to exclude damages in cases brought by the federal government but it did not include that same exclusion in cases against in the private right of action provision. And then the other point on RLUPA damages I'd like to briefly make is related to the Aramark defendants who are private actors acting under color of law. So this court has never decided whether damages are available against such private actors but there is good reason to think that they should be allowed. So money damages against private citizens do not raise the same separation of powers concerns that troubled this court in height. This court said in height that if Congress intends to alter the usual constitutional balance between the states and the federal government must do so in an unmistakably clear way. But there's no usual constitutional balance to upset when we're talking about private actors and not the state itself. If I could ask in conclusion what's your position with regard to the Aramark defendants who are sued but they don't seem to have participated and is something going on with them or what's your position on that? So the district court dismissed the claims against the Aramark defendants under its authority under 1915g. Under what? 1915g. So the Aramark defendants didn't appear in the district court below so haven't appeared on appeal. Now I think if this court is troubled by the lack of representation on their part on appeal it could certainly appoint an amicus to do supplemental briefing on this question or it could remand the district court to do this analysis in the first instance. Thank you. Thank you very much. You'll have your rebuttal time. Thank you. Good morning, your honors. My name is Mindy Worley and I'm here representing only the state defendants, the state appellees. You've just heard my friend's explanation, SPIN, as to why Judge Helmick's decision reversing or dismissing this case should be reversed. But SPIN can't fix the deficiencies in the complaint nor can SPIN create a cause of action or a claim for relief when all that's present in the complaint are treadbare recitals of elements of the claim with only conclusory statements in support thereof. Now let's turn first to the dietary claims that my friend raised with regards to RLUIPA. Those claims are moot. When all of the briefing took place before Judge Helmick, Mr. Mustin was incarcerated at Marion, but by the time the judgment was rendered he'd been transferred to Grafton. He's no longer at Marion. So the RLUIPA claims are moot across the all of the claims with which this matter is concerned. Well, where is he now? Is he still incarcerated? He's incarcerated at Grafton Correctional Institution. No longer at Marion. Not since 2023. Why would his claims for past harms become moot simply because any claim arising after his transfer against the other prison might? But I don't understand if the remedy you seek is damages, why your transfer would moot all the claims? Your Honor, I'm only referring to the RLUIPA claims because those are for injunctive prospective relief. Not to 1983. You're not saying any of the damages claims are moot? And that's the answer to my friend's argument with regards to why RLUIPA should provide damaged claims for individual capacity, state employee allegations. They still can get damages if they can prevail, if they state a claim in their complaint. They can get damages under 1983. And with regards to RLUIPA, I'll just swing to that and then I'll go back to food. RLUIPA was enacted under the Spending Clause and the Commerce Clause under Section 1 of the Constitution, or Article 1 of the Constitution. Whereas both RFRA and 1983 were enacted under the 14th Amendment. And they're distinct areas of the Constitution. They allow for distinct individual capacity basis. RLUIPA does not. RLUIPA operates like a contract. It imposes privity. It imposes conditions upon the recipient of federal funds. And only those recipients are required to prevail or required to provide whatever those conditions mandate. With regards to third parties like state employees, they are not subject to those conditions. They don't receive the money. They're not grant recipients. And therefore, RLUIPA would not provide for state employee individual capacity damage remedies. So let me go back to the food quality that my friend raises. First of all, this was a 36-page complaint that the appellant submitted to Judge Helmick for review. This was not his first time on the block. This is the fourth time he's filed a complaint against essentially the same defendants. Aramark defendants and state employees alleging poor quality of food. Judge Zuhairi dismissed it, failure to state a claim. Judge Carr dismissed it, failure to state a claim. And Judge Helmick dismissed two of his complaints for failure to state a claim. And in fact, the third time, the fourth time that the complaint was dismissed by Judge Helmick, which is our complaint, or actually, which was the third complaint, not our complaint, the third complaint. Well, did you raise some kind of claim preclusion defense in this particular case because of all the other litigation? I did not, Your Honor. But if it goes back to the trial court, that would be one of the defenses. Judge Helmick dismissed the third complaint after he dismissed ours and said that the poor food quality, the raw boiled eggs, how an egg can be boiled and be raw is beyond me, but that's what they claim. The close to expired milk, nowhere does he ever claim that the milk was spoiled. The stale bread, well, the meals for Zuhairi, I'm sorry, for the breakfast meal are made the night before. So if the bread got a little bit dry, it got a little bit dry, that doesn't mean it's expired or stale. Moreover, it was Aramark who provided the food. It wasn't any of the state appellees. Now, where does the complaint say that the state appellees provided the food or produced the food or served the food? More than that... Any idea why the Aramark defendants didn't appear? It appears that they were served. Is that correct? Your Honor, I don't know. I really don't know why they didn't appear. They appeared in the other three cases. They did not appear in this case. But long story short, state employees have no direct involvement. There's no personal involvement in the food that was served to Mr. Mustin, whether it was over Ramadan or any other time. Plus, while he's got a right to food that's nutritionally adequate and serves his health, keeps him in a healthy status, nowhere in the complaint does he say he's hungry. Nowhere in the complaint does he say he got sick. Nowhere in the complaint does he say that he lost weight. He says there's a potential risk of damage or potential risk of harm. That's all he ever says. So when Judge Helmick said, well, he didn't get harmed, in my opinion, that's a proper resolution of the claims because all the claims are are conclusory statements. There are no facts. There are no facts anywhere in the 36 pages that he alleges. Same thing with regards to dates. He says that he was only given dates for nine of the 30 days of Ramadan. He also says in the complaint that the dates were stolen. With regards to food, he also says that Ramadan food was served and that he blames Aramark for serving what he called freestyle chow meals because when the Ramadan food was stolen, Aramark wasn't able to follow the state's menu. And then again, he alleges that the menu that he was served, the food he was served, was calorically insufficient and was not nutritious. But he's got no evidence, no facts in support of that. He just says it was small portions. But this is at the motion to dismiss stage. You may have terrific defenses at summary judgment and so forth, but we're at the motion to dismiss stage with a pro se plaintiff. How does that affect it? All he does is allege threadbare statements. I don't know how threadbare it is to allege that the portions of food that you were served are insufficient to support your personal health. You can only require certain things at the pleading stage. You can't require him to go out and get a medical exam. That's just not part of pleading. He never says he was hungry. He never says he lost weight. He never says he got sick. He never makes any factual allegation with regards to why this food did not serve to keep him healthy. The way I read it, he says the plaintiff's lack of nutrition distracts him from reading the Koran, praying, and fulfilling his religious obligation of achieving fasting properly. Is that the basic place where it occurs? I think it's page 13 of the complaint. Your Honor, he does say that. But again, that's just a conclusory statement. What is a complaint anyway? Obviously you could have different degrees of detail in a complaint. But it's all just allegations at the complaint stage. There's a certain amount, there are certain standards you apply to it. But this sounds to me like kind of a nitpicky approach to he should have said this instead of what he said. I'm just not sure that kind of second guessing is really appropriate, particularly when we can tell the complaint is pretty clear for a pro se litigant as to what exactly he's complaining about and what prison practices he's complaining about and what he thinks the results are for him. He may not be able to prove any of that. But it's a fair degree of specificity rather than the picture you're painting, I think. Let's just go with that for a minute then. If that's true, it's still Aramark who's providing him the food. It's not the prison. They're not preparing it. They're not serving it. They've got a menu. Whether or not it's followed, he alleges it wasn't. I'm not sure about the complaint on this point. I'm pretty sure it doesn't address this. But it would seem to me that in order to blame Aramark rather than the other defendants, we would have to know something more about the relationship. You're asking us to make assumptions about the relationship between the institution and Aramark and who's exactly responsible for what. You're inserting facts that aren't included in the record rather than, at least I don't think they are, rather than just taking what he says and saying, is that sufficient? But he also says that it's Aramark who's serving him when he calls. So he wants to be sure to allege what he thinks the basis for liability of Aramark is. But it doesn't mean you've taken it a step further and you've said, well, you know, the prison officials don't have anything to do with what Aramark does. And that is not, I don't think it's in the record. He does say that it's Aramark who serves the food, prepares the food, isn't following the menu because the food was stolen, and is serving freestyle chow meals instead. So he's not saying that, you can't charge the state employees under Respond Yet Superior under either RLUIPA or under 1983. And there's no personal involvement alleged by any state employee with regards to any of the food service or dates that allegedly were stolen. Hite and Ackerman are both in opposite in this case. In Hite, you've got pemmican that the Native Americans wanted for the powwows. And what happened was they offered to pay for it themselves. And the prison official said, no, you cannot, you cannot bring it into the prison. Same thing with regards to Ackerman. And Ackerman, even if the plaintiffs in Ackerman were willing to pay for their own dairy and meat for Jewish holidays, they were not permitted by the prison to bring it into the chow hall or the dining hall during holidays because the food was, I believe, vegetarian. And so they were barred, specifically barred, even disallowed from providing those foodstuffs on their own dime. That didn't happen here. In this case, the complaint alleges that the imam brought in dates, the dates were stolen. There was no obligation for the prison to purchase more dates in support of Ramadan. With regards to equal protection, for instance, there's no similarly situated comparable group that's alleged. There's no allegation that Jews were provided matzah that got stolen over Passover that the prison had to or would purchase matzah to replace it. Same thing with wine or grape juice, even though appellant. He's simply alleging that other members of other religious groups are treated better than his group. That's his equal protection argument, isn't it? He needs to specify a similarly situated group that's not treated or that is treated preferably. Well, he's saying that the Christian group got to use Friday nights for this space for their worship and he and Muslims were not. He's got maybe a few other contentions in there as well. He does say that other religious groups were better treated. Your Honor, he says that when there were large Christian gatherings, they got to use the chapel because there were more people present. In the record, you'll find that there were generally not more than 30 attendees at Jummah services. That's at ECF number 3-1, page ID 75. Who says that in the record? That's part of the grievance dialogue that goes back and forth. The plaintiff attaches to his supplemental complaint. My general question here is on some of these, like the size of the groups, am I right? The state doesn't make a defense and say, look, the Christian group is bigger so we give the bigger group the bigger space. You're sort of inferring it. Are you from his claims? That's correct. In the grievance dialogue, the emails that he attaches to his supplemental complaint, you can see that the numbers he talks in terms of attending Jummah vary between 30 and 36 and 39 and 40. There are three different complaints he's filed. The operative complaint that we're dealing with today is ECF number 9. That's his third complaint. But the court received all these papers in advance of that third complaint being filed. In those papers, the numbers with regards to Jummah change. It's very clear that Jummah was moved on occasion when a larger group needed the chapel space. Isn't the allegation also that there was no need for the Christian events that were held on Friday afternoon to be held on Friday afternoon, but that prison officials arbitrarily chose a time when Muslims under religious rules had to have Jummah? His allegation, I think, is that Christians were allowed to use the chapel or the larger room whether they had any religious need to do so or not. Isn't that a part of it? So that occurred on Kairos Weekends, which run from Thursday through Sunday. It's a three and a half day seminar in effect that's run by volunteers and they have study and they have meditation and they have learning and they have a gathering of in excess of 100 people. There's no Christian rule that says you could only have this kind of event on a Friday afternoon, is there? Well, you have it on a weekend because that's when the volunteers are available. And so it runs from Thursday afternoon to Sunday afternoon. And that's when the prison, several times or however many times a year, it's not an every Friday basis. But that's the room space in the chapel is made available. More specifically with regards to moving Jummah or Talim. Giving us information that's justification information that's not in the complaint, right? In the complaint specifically at ECF number nine, page ID 126, it says it was unidentified lieutenants and captains who caused Islamic services to be moved in order to accommodate larger prison gatherings. And that's not any of the state employees. None of the state employees are captains or lieutenants. There's no personal involvement in the movement of Islamic services. We need more than what's in the complaint, don't we? Aren't you trying to give us additional facts? No, that fact is in the complaint. Again, ECF number nine, which is the operative complaint, page ID 126. He claims that it was unidentified lieutenants and captains who caused Islamic services to be moved in order to accommodate larger Christian events. It's not any of the state defendants or state appellees. Who are the lieutenants and captains? He doesn't identify them. I mean, the state appellees are Wayne Wright, who's the warden, Watson, who's the assistant warden, Turner, who's the food services supervisor out of central conduct report. There's a sergeant around. Why are we so assured that there aren't any lieutenants or whatever the other thing was? Captains. Yeah, captains. I mean, the chaplain is not, I mean, none of the state defendants or appellees are captains or lieutenants. They have their own, and he even identifies those specific positions in his complaint. None of them are identified as a lieutenant or a captain. So in sum, the essence of Appellant's complaint was that his religious exercise was substantially burdened, forcing him to follow his religious beliefs or keep letting them, prison officials, disrespect his religion. Time and time again throughout the complaint, it's peppered with, they're going to disrespect my religion by doing this. The room space wasn't important to him. There's no personal involvement. There's no similarly comparative religious group for equal protection. And again, and I understand that it's a complaint, and I understand that these are allegations. You might want to wind up. Your light's been on quite a while. Thank you, Your Honor. I see my time is up. If you have no further questions. Thank you. Thank you. Thank you very much. Thank you, Your Honors. So first to address personal involvement, because that was a bit of a theme for my friend on the other side. So as to the food related claims, there is personal involvement by the state defendants as well as the Aramark defendants. Turner is the food service operator at Marion who is not employed by Aramark. She's employed by the state. As well as Watson, the deputy warden of special services is named as a defendant for that claim. He alleges that Turner and Watson are supervisors of Geer and Bianchi, who are the Aramark food service defendants or two of the Aramark food service defendants. He alleges that he complained multiple times to Turner and Watson as well as Plank, who's the institution inspector at Marion. And in Hayward, this court said it's enough to get past a motion to dismiss where the complaint is sufficient to plausibly suggest that the defendants knew about his complaints and failed to act. So again, he alleged he filed multiple complaints and those are listed at R9, page ID 130, as well as at page ID 124. So the idea that he hasn't sufficiently alleged personal involvement of any state defendants for the food service claim or the food related claims, it's just not, it's contradicted by the complaint. Similarly with the Jumaah claim, he alleges that again, defendant Watson, Smith and Rainwright and Plank were the responsible defendants for that. He alleged multiple complaints to them about it. Again, that's at R9, page ID 124. The complaint alleges that it was their decision to move the Jumaah services. That's at page ID 125. It's also common sense that the Warrant of Special Services who oversees sort of religious programming would be responsible for that. This is a strong inference of authority at page ID 141, 142 and 126. The reply at pages six through nine walks through the specific allegations, although I'm happy to go through those here if it'd be helpful. And he also alleged that he filed a grievance with Plank and Plank actually agreed with him about it being an issue and an unsafe location for Jumaah, but still did nothing to fix it. Again, under Hayward, that is sufficient to show that she knew about the problem, but didn't do anything about it. And again, we are at the motion to dismiss stage here. Much of the information that will be required to parse that personal involvement as Judge Gibbons identified really can only come in through discovery when he gets staff handbooks, internal communications, things like that. But he's alleged enough to get past the motion to dismiss stage. So briefly to go to the substance of the claims. So again, as Judge Clay and Gunners identified, he did allege spiritual injuries and this court has said that those are compensable injuries under Welch and Hurd. So he doesn't need to allege that he was hungry or that he lost weight or anything like that. It was enough that he alleged specifically the ways in which it affected his religious practice during the holy month of Ramadan. And just one quick clarification. It does say that the milk was expired. My friend on the other side was mixing up the bananas, which were close to expired, and we don't make any allegation about that in our briefs, but the milk in fact was expired. That's at RNI and page ID 129. And on the frequency of Jumaah, my friend on the other side, as your honors identified, was trying to bring in things outside the complaint, say that it was only on Cairo's weekends and things like that. But the complaint, I think, is quite clear that it was a regular occurrence. The complaint twice explains that Jumaah was constantly moved. That's the words he uses. That's at RNI and page ID 125. And he says that it was moved to a fire hazard room on Fridays. Let me ask you one thing. What about these prior lawsuits that your opposing counsel says your client has filed? The implication is that they cover the same allegations. What do you say about that? I think as your honor identified, this is the first the state has brought this up in this case, either in the district court or on appeal. So if they were trying to make some kind of issue or claim preclusion argument, I think that's forfeited or even waived. And so I just don't think it's relevant to this court's analysis. I see my time has expired, but thank you. Thank you, your honors. And we would ask that you reverse the district court. Thank you very much for your arguments on both sides and the cases submitted.